[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The State of Connecticut acting through the Department of Children and Families designated as the Employer under the State Employee Relations Act a/k/a Collective Bargaining for the State Employees, pursuant to Conn. Gen. Stat. § 5-270 (a) et. seq., seeks an order under §52-418 of the General Statutes vacating a certain arbitration award. The defendant, New England Health Care Employees Union, District 1199, seeks in its cross application an order confirming the award.
The plaintiff, State of Connecticut, and the defendant, New England Health Care Employees Union, District 1199, (hereinafter Union), entered into negotiations for a collective bargaining agreement with respect to wages, hours and conditions of employment covering the period from July 1, 2001 to June 30, 2005, pursuant to Conn. Gen. Stat. § 5-276a. This collective bargaining agreement contains provisions with respect to wages, hours and conditions of employment of certain health care employees of the state. The Union represents bargaining unit members in the Clinical Department at Long Lane School and the Connecticut Juvenile Training School (hereinafter CJTS).
Pursuant to the collective bargaining agreement, the parties submitted a controversy to arbitration regarding a schedule change implemented by the Department of Children and Families arising from a grievance filed by the Union, involving Articles 2 and 13, § 6[1] of the contract. The CT Page 8203-y Union grieved the institution of a second shift for clinical staff at CJTS. Barbara C. Deinhardt was designated as the arbitrator. The parties joined in framing the issue to be arbitrated before Ms. Deinhardt. The language of the submission was framed as follows:
 This issue before me is whether the schedule change implemented by the Department of Children and Families ("The Agency") violated Article 13, Section 6 and/or Article 2 of the collective bargaining agreement and if so, what shall be the remedy consistent with the agreement.
Hearings occurred on December 5, 13, and 20, 2001. The arbitrator issued the following award dated January 29, 2002:
 The undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having considered the evidence and arguments of the parties, awards as follows:
 1) The Agency violated Article 13, Section 6(A) of the contract by implementing the second shift as constituted on November 2, 2001.
2) This Award shall not take effect until March 1, 2002.
 3) The second shift shall stay in effect as presently constituted until March 1, 2002, or until the parties reach agreement otherwise whichever comes first.
 4) On March 1, 2002, if no agreement has been reached nor new negotiations completed on any substitute schedule adjusted to meet the current needs of the clients, families, Agency and employees, the schedule existing prior to November 2, 2001 shall be reinstated and those employees who have left because of the schedule at issue here given an opportunity to return to their previous positions, if available, if no reason precluding reinstatement exists.
Grievance sustained.
The Union claimed anti-union animus was the motivation for the schedule implemented and as such violated Article 2, Section 2 of the collective bargaining agreement. Since the arbitrator sustained the grievance on other grounds she did not address the Union's argument about any discriminatory intent underlying the schedule change. Accordingly, that claim is not before this court for consideration.
The arbitrator focused on the provisions of Article 13, Section 6 most CT Page 8203-z specifically the provision dealing with the procedure when the employer wishes to make a facility work schedule change. The parties have conceded there has been compliance with procedural guidelines of timeliness and negotiating. In dealing with the proposed schedule changes the arbitrator under the collective bargaining agreement must give weight to the following factors in the following order of priority: The impact on patient/client care and services to their families, the impact on the Agency/Department, and the impact on the employees. The agreement prioritizes these factors.
Some of the background information which was in the form of testimony to the arbitrator, is helpful in considering the Agency's proposed shift changes. The Connecticut Juvenile Training School (CJTS), where these shift changes would be implemented, is a new facility for adjudicated youthful offenders. The residents of this training facility are between the ages of 14 and 18 years. This new facility was opened on August 27, 2001. This facility was commissioned as a result of P.A. 99-26, "An act concerning the juvenile training center."
The actual transfer of residents into CJTS took place on August 27, 2001, and October 1, 2001. Prior to August 27, 2001, the adjudicated youth were housed at Long Land School. Long Lane School and CJTS are at different locations in the same city (Middletown, Connecticut) and are a short distance from each other. At Long Lane School both boys and girls were housed. This segregation came about by Public Act 99-26. This same public act established new standards for the length of stay for the youths. The new period is a minimal commitment of one year. The goal and purpose at CJTS is to increase mental health interventions and decrease the correctional (penal) approach to these youth.
Prior to PA 99-26 there had been ongoing studies, interest and plans to develop a more rehabilitative setting and programs for these adjudicated youths. The suicide death of resident T. Brown in September 1995 was a catalyst to additional studies and recommendations concerning both the physical facility and the mental health program for these youths. Ms. Brown's suicide occurred at 4:00 p.m., on a Saturday; no clinical staff was present at the facility.
During the construction of CJTS, employees and their union representatives were actively informed of plans and progress. The concerns over programming and staff coverage at CJTS were great enough to cause the union to ask for a sub-committee on this subject during the 1999-2000 contract negotiations.
Throughout the post-T. Brown studies and reports, concerns are expressed over the lack of emphasis on mental health programs. An item of CT Page 8203-aa significant concern was the "lack of a clinical presence" during evening hours. These were shortcomings that existed at Long Lane School. Patterns which existed at Long Lane School had been determined inadequate, change was essential.
One such essential change was the creation of an evening shift for clinical staff. Other staff involved with resident interaction already had an evening shift and presence. It was the clinical staff that had no second shift presence at the facility. Following unsuccessful negotiations over the establishment of a second (evening) shift for the clinical staff, facility management implemented a second (evening) shift.
It is this new shift that has brought the parties to arbitration.
During the arbitration both parties addressed the issue of impact on employees. The union's key witness on this point was Pat Hogan who conducted a one-question survey of the clinical employees. It was not disclosed whether the survey included the total clinical staff or only those who were assigned to the evening, 1:00 p.m. to 8:00 p.m., shift. This survey indicated no positive impact for employees from the schedule change. It goes on to indicate negative impact in the disruption of personal lifestyles and routines. The survey indicates the eventual departure of seven employees due to the dislike of the shift assignment. The staff complained of having no time for their children or spouses, of having to give up a part-time job or the ability to teach a class, and of general stress and disruption to their lives. As for problems staff saw as impacting on them professionally because of the hours of the second shift, superintendent Mara testified that treatment planning conferences happen only once at the beginning of each child's stay at CJTS; that administration case reviews occur once every six months; that 30-day evaluation conferences happen only once for each client; that PPT meetings can be held at any time and clinicians do not need to attend PPT meetings. She also testified that parole officers work varying times, that pupil service specialists work until 3:30 p.m. and can meet at 1:00 p.m.; and that DCF workers work until 4:30 p.m. and can meet after 1:00 p.m. Superintendent Mara testified that the clinicians can meet with the students after 2:35 p.m.; that they do not need to wait until the evenings. Superintendent Mara responded in her testimony before the arbitrator to each and every concern voiced by the clinical staff regarding these activities which they felt could not be engaged in within the 1:00 p.m. to 8:00 p.m. second shift period.
The union's articulated position as referenced in the arbitrator's decision is that "the needs of the clients and the Agency can be well met with a smaller second shift, staffed by volunteers as permanent second CT Page 8203-ab shift employees (who presumably are able to accommodate their personal lives to the hours) are hired, supplemented by the on-call system." (Decision p. 10)
The opinion of the arbitrator is premised on her view of Article 13 of the collective bargaining agreement as not giving clear guidance to the arbitrator as to the standard to be used in determining the appropriateness of the schedule under the contract, other than to say that these three factors must be taken into account and given weight in the priority noted. She concludes that her charge is to determine whether, given those factors, considered in their proportional weight, the schedule is a reasonable one. Arbitrator Deinhardt misstates her charge. The issue before her is whether the schedule change implemented by the Agency violated Article 13, Section 6 and/or Article 2 of the collective bargaining agreement.
Arbitrator Deinhardt is of the opinion that she must balance the various interests and analyze whether the decision made by the Agency strikes a reasonable balance of the various factors, given their appropriate weight. She feels it is not enough to conclude that if the impact on the clients and the agency is largely positive and the impact on the employees is largely negative, the positives win. She postulates that for her to conclude that the agency would prevail merely by demonstrating that the schedule change is in its best interests and those of the clients and families, would render superfluous the contractual requirement to weigh all three factors, including the impact on employees.
In fact, the duty imposed on the arbitrator under Article 13, Section 6, when dealing with a shift change such as this, is to put the Agency to its proof that the change which is being sought is necessary and dictated by the needs of the institution for which it has responsibility. Once this is established the negative impact on the clinicians must give way to the first two. In fact this is what the arbitrator found. Having so found she should have stopped and rendered a decision in favor of the Agency. Instead she goes on to expand her charge to one which should take into account whether the schedule implemented is the only/best/most advantageous way to achieve the positive results for the clients and the Agency and whether the negative impact on the employees could have been minimized. Arbitrator Deinhardt while acknowledging that it was not in her authority to direct an alternative schedule states "I find that I must determine whether, given other possible alternatives, the schedule implemented is a reasonable balance of client/agency interest and employee interest (with requisite weight being given to the former). (Decision p. 15) CT Page 8203-ac
The arbitrator placed considerable weight on the clinician's assessment of the disruption of the second shift on their ability to do their job. This in spite of the fact that Superintendent Mara refuted in her testimony each and every problem raised by the clinicians.
The arbitrator found that the Agency had presented persuasive evidence, undisputed by the Union, that a "clinical presence" on the second shift was very important to patient care and to Agency operations. She stated her concern was limited to whether the benefit to the clients and to the Agency required this particular second shift schedule at the time it was implemented. (Decision p. 17)
In fact, her concern should have been whether the schedule change implemented by the Agency violated Article 13, Section 6. Once she had determined that the Agency had presented persuasive evidence that a clinical presence on the second shift was very important to patient care and to Agency objectives, she should have denied the grievance. Instead she used the language of "clinical presence" to bootstrap herself into doing an analysis of what that clinical presence should consist of.
Arbitrator Deinhardt took issue with the decision of Arbitrator Garitty who was faced with a similar issue of changing schedules for doctors at the Veteran's Hospital in Rocky Hill, Connecticut. In that case the doctors had also complained that the new schedule was disruptive, especially as to their maintaining part-time practices. However, in spite of this negative impact on employees, Arbitrator Garitty found that the agreement was clear in prioritizing the three factors and opined that if a change has a positive .impact on patient care and on the agency or department, and a negative impact on the employees, it must be upheld. For this reason she contended that the State did not violate Article 13, Section 6 when it implemented the schedule change at the Rocky Hill Veteran's Hospital.
Arbitrator Deinhardt did not agree with Arbitrator Garitty and said so in her opinion. Arbitrator Deinhardt is of the opinion that there has to be a balancing of all three interests otherwise the employees personal interests would always give way to the interests of the client and the agency. The short answer to that is that if the agreement had intended a balancing of all three interests it would have said so and provided guidelines for how that would take place.
The agreement used the language of priority: Webster's Third International Dictionary (unabridged) defines priority as "the quality or state of being prior"; PRIOR is defined as "taking precedence in importance". CT Page 8203-ad
In the instant case Arbitrator Deinhardt had overwhelming evidence put before her suggesting the need for the schedule change in the interest of improving both client care and agency management responsibility, she also had testimony before her which countered the assertions of the clinicians that they would be unable to perform their jobs professionally. She was left with the personal reasons given by the clinicians which were complaints that the new schedule would leave them no time for their children or spouses, that they would have to give up a part-time practice or the ability to teach a class, and of the general stress and disruption to their lives.
"The scope of judicial review of arbitration awards is very narrow. Our courts favor arbitration as a means of settling differences and uphold the finality of arbitration awards except where an award clearly falls within the proscriptions of § 52-418 of the General Statutes . . . Section (a)(4) of General Statutes § 52-418, the subsection under which the [plaintiff] pursues its claim of error, provides in part that an award is invalid if the arbitrators have exceeded their powers or imperfectly executed them that a mutual, final and definite award upon the subject matter was not made. Generally, any challenge to an award pursuant to General Statutes [§ 52-418 (a)(4)] on the ground that the arbitrators exceeded or imperfectly performed their powers is properly limited to a comparison of the award with the submission . . . f the aware conforms to the submission, the arbitrators have not exceeded their powers." Exley v. Connecticut Yankee Greyhound Racing,59 Conn. App. 224, 228 (2000).
The Union claims that the award must be upheld because of its unrestricted submission. The holding in Garrity v. McCoskey, 223 conn. 1, 6 (1992) states otherwise. "Even in the case of an unrestricted submission, we have, however, recognized three grounds for vacating an award: . . . (3) the award contravenes one or more of the statutory proscriptions of § 52-418 (citation omitted)" supra at 6. Thus, it makes no difference whether the submission was unrestricted once the arbitor has violated § 52-418 (a)(4). And, indeed, this court finds that Arbitrator Deinhardt has violated § 52-418 (a)(4) by pointedly ignoring the language of Article 13, Section 6 which on its face leaves no question that she was to consider the needs of the client first, then the Agency's interests, second, and finally the employee interests third. By focusing on the negative impact that the shift change had on the employees personal lives, Arbitrator Deinhardt in effect reversed the order of priorities called for in Article 13, Section 6. She put the employee interests first. She put clinical assessment, care and treatment of children and the judgement of the Agency charged by law with the care and oversight of these adjudicated children as to what was the best way to discharge this responsibility below the personal interests of CT Page 8203-ae clinicians as to their after-hour activities and childcare needs.
For the reasons stated the Motion to Vacate the Arbitration award is granted. Furthermore, for the same reasons that the Motion to Vacate is granted, the Motion to Confirm is denied.
 ___________________ Hennessey, J.